## DANBURY INSURANCE COMPANY *v.* JOSEPH NOVELLA ET AL.

| Superior Court | Judicial District of Danbury | File No. CV950319911S |
| --- | --- | --- |

Memorandum filed November 11, 1998

*Halloran & Sage*, for the plaintiff.

*Riefberg, Smart, Donohue & Nejame*, for the named defendant.

*Early, Ludwick & Sweeney*, for the defendant Sandra Kim.

I

## INTRODUCTION

LAGER, J. The Danbury Insurance Company (Danbury) brought this declaratory judgment action in three counts seeking a determination of its obligation to defend and indemnify the Novellas against claims made against them as landlords by their former tenant Sandra Kim, a minor, for personal injury from alleged exposure to toxic levels of lead-based paint. Danbury has moved for summary judgment solely on the ground that the "absolute pollution exclusion" clause contained in the applicable liability policy excludes coverage for the claims made against the Novellas.[1]

In the personal injury lawsuit,[2] it is alleged that Kim and her mother, Siyeth Kol, resided at 7 Thorpe Street Extension, in Danbury, which was owned by the Novellas, from approximately December, 1989, through August, 1993. The complaint alleges that during this time period, Kim was "exposed to dangerous, hazardous and toxic levels of lead paint in excess of both 0.06% and 0.50% lead by dry weight in intact and nonintact conditions on the interior and exterior surfaces of the premises," causing her personal injury.

Danbury issued an Owners, Landlords and Tenants Liability Insurance Policy, No. D 863 (policy), to the Novellas for 7 Thorpe Street Extension from December 22, 1992, through December 22, 1993. The policy contains an endorsement entitled "Pollution Exclusion" (clause). The pertinent language excludes coverage for "bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal,

---

[1] A decision that coverage is excluded would be dispositive of this case without the need to address the merits of the second and third counts.

[2] *Kol* v. *Novella*, Superior Court, judicial district of Danbury, Docket No. CV940318511S (February 27, 1996).

release or escape of pollutants . . . at or from premises owned, rented or occupied by the named insured." The clause defines pollutants as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."

In *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, 231 Conn. 756, 769–75, 653 A.2d 122 (1995) (*Heyman*), our Supreme Court concluded that fuel oil spilled into a waterway[3] was clearly and unambiguously a pollutant within the meaning of a substantially similar absolute pollution exclusion clause. Danbury relies on *Heyman* to maintain that the "Supreme Court has determined that the provisions of the absolute pollution exclusion clause are clear and unambiguous." *Heyman*, however, instructs this court to determine whether the clause is clear and unambiguous "as applied to the particular facts of this case." Id., 775. A term or clause may be clear and unambiguous in one context, yet subject to more than one reasonable interpretation in another. Thus *Heyman*, which presented a clear case of environmental pollution, does not automatically answer the question in this case, but simply provides the analytic framework this court must employ in its determination. "Under our law, the terms of an insurance policy are to be construed according to the general rules of contract construction. . . . The determinative question is the intent of the parties, that is, what coverage the . . . [plaintiff] expected to receive and what the defendant was to provide, as disclosed by the provisions of the policy. . . . If the terms of the policy are clear

---

[3] The *Heyman* court used the following synonymous descriptions for the incident in question: "fuel oil released into a waterway such as the Stamford Harbor"; *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, supra, 231 Conn. 771; "fuel oil spilled into a waterway such as Stamford Harbor"; id.; "introduction of fuel oil into a waterway"; id., 772; "presence of fuel oil in the harbor"; id., 772–73; "oil spilled into Stamford Harbor"; id., 773; "oil in a waterway"; id., 774–75; and, "oil spilled in a waterway." Id., 775 n.19.

and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . . However, [w]hen the words of an insurance contract are, without violence, susceptible of two [equally responsible] interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted. . . . [T]his rule of construction favorable to the insured extends to exclusion clauses." (Citations omitted; internal quotation marks omitted.) Id., 769–70.

The test under *Heyman* is whether the pollution exclusion clause clearly and unambiguously excludes as a pollutant lead paint in the condition described in the underlying complaint in the personal injury case, that is, "toxic levels of lead paint in excess of both 0.06% and 0.50% lead by dry weight in intact and nonintact conditions on the interior and exterior surfaces of the premises." To put it more simply, the first question is whether the only reasonable interpretation of the clause would categorize lead paint itself, on the interior and exterior surfaces of a residence, as a pollutant.[4] The second question is whether the exposure as alleged in the underlying complaint constitutes a discharge, dispersal, release or escape under the terms of the policy. Both questions must be answered affirmatively for the pollution exclusion clause to apply.

## II

## IS LEAD PAINT A "POLLUTANT?"

Danbury maintains that lead paint is a "solid irritant," a "contaminant" and a "waste" within the meaning of

---

[4] As counsel for Danbury put it at oral argument: "For the purpose of the exclusion you would look at the language and determine whether or not the lead paint, which [is] the basis for the underlying lead paint case . . . and that can come in forms of the paint itself. . . . So just the lead paint itself would be the pollutant." For the balance of this opinion, the term "lead paint" should be read to refer to toxic levels of lead paint on the interior and exterior surfaces of a residence.

the clause. The clause provides, in pertinent part, that "[p]ollutants means any solid . . . irritant or contaminant including . . . waste. Waste includes materials to be recycled, reconditioned or reclaimed." In *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, supra, 231 Conn. 772, the court relied not only on the policy's definition of a pollutant as a "contaminant" or "irritant," but also turned to dictionary definitions of the words "contaminant," "contaminate," "pollutant" and "pollute."[5]

## A

Is Lead Paint a "Solid Irritant" or "Contaminant?"

Whether lead paint can reasonably be categorized as a "solid irritant," "contaminant" or more broadly as a "pollutant" within the meaning of the clause is open to question. "The reach of the pollution exclusion clause must be circumscribed by reasonableness, lest the contractual promise of coverage be reduced to a dead letter." *Donaldson* v. *Urban Land Interests, Inc.*, 211 Wis. 2d 224, 233, 564 N.W.2d 728 (1997).[6]

---

[5] "The dictionary defines 'contaminant' as 'something that contaminates,' and it defines 'contaminate' as 'to soil, stain, corrupt, or infect by contact or association' or 'to render unfit for use by the introduction of unwholesome or undesirable elements.' Webster's Third New International Dictionary (1986). Similarly, the dictionary defines 'pollutant' as 'something that pollutes . . . a polluting substance, medium, or agent,' and it defines 'pollute' as 'to . . . impair the purity of . . . to make physically impure or unclean.' Id." *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, supra, 231 Conn. 772.

[6] This court recognizes that in *Heyman*, the Supreme Court discussed, in a footnote, its unwillingness to follow other courts that have criticized the potential breadth of such words as "irritant" and "contaminant" when used in pollution exclusion clauses; see, e.g., *Pipefitters Welfare Educational Fund* v. *Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992); *Westchester Fire Ins. Co.* v. *Pittsburg*, 768 F. Sup. 1463, 1470 (D. Kan. 1991); and noted "that many substances, including fuel oil, otherwise considered to be useful or beneficial, necessarily become 'contaminants' when released into the environment." *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, supra, 231 Conn. 775–76 n. 20. Those comments, however, were made in a case that unquestionably involved environmental pollution. In the context of a claim of lead poisoning due to exposure to lead paint, it is not necessarily

Many courts have concluded that lead paint on the surfaces of a residence is not unambiguously a pollutant within the meaning of pollution exclusion clauses. See, e.g., *Sphere Drake Ins. Co.* v. *Y.L. Realty Co.*, 990 F. Sup. 240, 243–44 (S.D.N.Y. 1977); *Lefrak Organization, Inc.* v. *Chubb Custom Ins. Co.*, 942 F. Sup. 949, 955–57 (S.D.N.Y. 1996); *Ins. Co. of Illinois* v. *Stringfield*, 292 Ill. App. 3d 471, 476, 685 N.E.2d 980, 226 Ill. Dec. 525 (1997); *Sullins* v. *Allstate Ins. Co.*, 340 Md. 503, 516, 667 A.2d 617 (1995); *Atlantic Mutual Ins. Co.* v. *McFadden*, 413 Mass. 90, 92, 595 N.E.2d 762 (1992); *Generali-U.S. Branch* v. *Caribe Realty Corp.*, 160 Misc. 2d 1056, 1061, 612 N.Y.S.2d 296 (1994). While some courts have concluded to the contrary; see, e.g., *St. Leger* v. *American Fire & Casualty Ins. Co.*, 870 F. Sup. 641, 643 (E.D. Pa. 1994), aff'd without opinion, 61 F.3d 896 (3d Cir. 1995); the "overwhelming trend . . . has been to hold that [pollution exclusion] clauses do not exclude contaminants such as lead paint poisoning." *Sphere Drake Ins. Co.* v. *Y.L. Realty Co.*, supra, 243.

In *Lefrak Organization, Inc.* v. *Chubb Custom Ins. Co.*, supra, 942 F. Sup. 955–56, the court concluded that a pollution exclusion clause which defined "pollutant" to include any solid irritant or contaminant could reasonably be read either to include or exclude lead paint. Similarly, the Maryland Court of Appeals in *Sullins* v. *Allstate Ins. Co.*, supra, 340 Md. 510, concluded that reasonable people generally would not think of lead

clear that the lead needs to be released into the environment for a child to be exposed. For example, a child may ingest lead by chewing on intact painted surfaces. See part III of this opinion. Furthermore, the *Heyman* court's comments do not preclude this court from concluding that there is more than one reasonable interpretation of the words "irritant,' "contaminant" and "pollutant" as applied to the facts of the present case. For example, at least one court has concluded "that lead is not a 'contaminant' in paint to which it was added deliberately by the manufacturer . . . ." *Vance* v. *Sukup*, 207 Wis. 2d 578, 583, 558 N.W.2d 683 (App. 1996), vacated on other grounds, 211 Wis. 2d 529, 568 N.W.2d 297 (1997).

paint as an irritant,[7] and also found the terms "pollutant" and "contaminant" susceptible to two reasonable interpretations—one which encompassed lead paint and the other which did not. Id., 511. On the other hand, the court in *Ins. Co. of Illinois* v. *Stringfield*, supra, 292 Ill. App. 3d 475, considering a pollution exclusion clause identical to the one in the present case and using the same definitions of "contaminant" and "contaminate" relied on by the *Heyman* court; see footnote 5 of this opinion; concluded that lead-based paint was not a contaminant, stating: "With respect to whether such a definition encompasses the lead in the lead-based paint, a reasonably prudent layperson could conclude, based upon the definition alone, that it does not." *Ins. Co. of Illinois* v. *Stringfield*, supra, 475.

In *Atlantic Mutual Ins. Co.* v. *McFadden*, supra, 413 Mass. 92, the Supreme Judicial Court of Massachusetts held, in interpreting a pollution exclusion clause identical to the one in the present case, that "an insured could reasonably have understood the provision at issue to exclude coverage for injury caused by certain forms of industrial pollution, but not coverage for injury allegedly caused by the presence of leaded materials in a private residence." In determining that lead paint on residential surfaces is not a pollutant, the court adopted an "environmental" reading of the term "pollutant" in the pollution exclusion clause, reasoning that "the terms used in the pollution exclusion, such as 'discharge,' 'dispersal,' 'release,' and 'escape,' are terms of art in environmental law which generally are used with reference to damage or injury caused by improper disposal or containment of hazardous waste." Id. The United States Court of Appeals for the First Circuit in

[7] "Webster's Dictionary defines 'irritant' as 'something that irritates or excites' and 'irritated' as 'roughened, reddened, or inflamed.' . . . There is nothing before us to indicate that lead 'irritates' or that it is generally considered an 'irritant.' " *Sullins* v. *Allstate Ins. Co.*, supra, 340 Md. 510.

*United States Liability Ins. Co.* v. *Bourbeau*, 49 F.3d 786, 789 (1st Cir. 1995), adopted a similar rationale when it distinguished the circumstances of *McFadden*—"personal injury caused by the *presence* of lead paint in a household"—from the case before it—"injury to property caused by the alleged negligent *discharge* of lead paint onto property"—stating: "The latter is a classic example of 'pollution'—the discharging of a harmful substance onto land—while the former is most demonstrably not. An objectively reasonable person simply would not ascribe the word 'pollution' to the presence of lead paint in a house." (Emphasis in original.) Id.

Although *Heyman* did not expressly adopt an "environmental" reading of pollution exclusion clauses, its underlying facts, where fuel oil spilled or released into a waterway caused environmental damage, present a classic case of environmental pollution.[8] The *Heyman* plaintiff's claim to its insurer for reimbursement for the cost of remediating the environmental damage caused to the waterway, the shoreline and affected wildlife by the spilled fuel oil is significantly different from a claim by a landlord for defense and indemnification against a tenant's lawsuit for personal injury due to alleged exposure to lead paint on the interior and exterior of a rented apartment.

The clause must be deemed ambiguous because it is equally reasonable to conclude that lead paint may or may not be an irritant or contaminant, and therefore may or may not be a pollutant, within the meaning of

---

[8] The *Heyman* court's citation to *McFadden* arguably can be read as an implicit adoption of an "environmental" reading of this type of pollution exclusion clause. Quoting the "industrial pollution" rationale language of *Atlantic Mutual Ins. Co.* v. *McFadden*, supra, 413 Mass. 92, the court noted "*McFadden* . . . provides no contrary authority to the proposition that oil spilled in a waterway is a pollutant." *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, supra, 231 Conn. 775 n.19.

the clause. Furthermore, the clause may also be deemed ambiguous to the extent that a reasonable insured would interpret it to exclude coverage for claims arising out of factual circumstances more analogous to classic environmental pollution, but not for claims of personal injury allegedly sustained as a result of the type of paint covering the surfaces of rented premises. Accordingly, under our law, the interpretation of the exclusion clause which will sustain the claim of injury and cover the loss must be adopted. *Griswold* v. *Union Labor Life Ins. Co.*, 186 Conn. 507, 514, 442 A.2d 920 (1982).

## B

## Is Lead Paint a "Waste?"

Danbury next claims that lead paint is unambiguously a "waste" excluded by the clause. This claim likewise fails.

Lead paint on residential surfaces is not the same as lead paint waste. *United States Liability Ins. Co.* v. *Bourbeau*, supra, 49 F.3d 789. Neither intact nor nonintact lead paint on interior and exterior residential surfaces falls within the dictionary definition of "waste."[9] Intact and nonintact lead paint are not materials that are to be recycled, reconditioned or reclaimed.[10]

The dictionary definitions of the words "waste," "recycle," "recondition" and "reclaim" provide additional support for an "environmental" or "industrial pollution" reading of Danbury's pollution exclusion clause. Looking to those definitions; see footnotes 9

---

[9] Webster's Third New International Dictionary defines "waste" as "damaged, defective, or superfluous material produced during or left over from a manufacturing process or industrial operation" or "refuse from places of human or animal habitation such as . . . garbage, rubbish."

[10] Webster's Third New International Dictionary defines "recycle" as "to pass again through a cycle of changes or treatment"; it defines "recondition" as "to restore to a good condition"; and it defines "reclaim" as "to obtain from a waste product or by-product" or "to recover the useful material from."

and 10 of this opinion; it would be reasonable to conclude that the clause excludes coverage for injury caused by environmental or industrial pollution, but does not exclude coverage for injury alleged to be caused by exposure to lead paint. See, e.g., *Stoney Run Co.* v. *Prudential-LMI Commercial Ins. Co.*, 47 F.3d 34, 37–38 (2d Cir. 1995); *Sullins* v. *Allstate Ins. Co.*, supra, 340 Md. 503, 515–16; *Atlantic Mutual Ins. Co.* v. *McFadden*, supra, 413 Mass. 92; *Generali-U.S. Branch* v. *Caribe Realty Corp.*, supra, 160 Misc. 2d 1061–62. Furthermore, the absence from Danbury's pollution exclusion clause of a definition of waste that includes "materials to be disposed of" distinguishes this clause from the one under review in *United States Liability Ins. Co.* v. *Bourbeau*, supra, 49 F.3d 788, where the court considered lead paint chips stripped and removed from a building and deposited on abutting land to be a "waste" as so defined.

Finally, Danbury points to General Statutes § 22a-255g as evidence that lead is considered a waste under Connecticut law, but that citation is inapposite. Although the legislature there expressed its concern about the presence of heavy metals such as lead in packaging materials; see, e.g., General Statutes §§ 22a-225g and 22a-225i; it has also concluded that lead is not hazardous waste under certain circumstances. General Statutes § 22a-134 (4).[11] The cited statute does not provide support for an unambiguous reading of the "waste" portion of this pollution exclusion clause to include lead paint on interior and exterior residential surfaces as alleged in the underlying case.

[11] General Statutes § 22a-255g reflects certain legislative findings with regard to the presence of heavy metals in packaging waste. General Statutes § 22a-134 (4) provides in pertinent part: "[T]hat sewage, sewage sludge and lead paint abatement wastes shall not be considered to be hazardous waste for the purposes of this section and [General Statutes §§] 22a-134a to 22a-134d, inclusive. . . ."

## III

## WAS THERE A "DISCHARGE, DISPERSAL, RELEASE OR ESCAPE?"

Under the terms of the policy, coverage is excluded only for damages resulting from the "actual, alleged or threatened discharge, dispersal, release or escape of pollutants." These terms limit the ways "by which the pollutant must travel from a contained place to the injured person's surroundings and then cause injury." *Lefrak Organization, Inc.* v. *Chubb Custom Ins. Co.*, supra, 942 F. Sup. 953. As applied to personal injuries alleged to have been caused by exposure to toxic levels of lead in lead-based paint, there is more than one reasonable interpretation of these terms. Although "it is arguable, and several courts have found, that the presence of lead dust or chips in an apartment qualifies as 'discharge,' 'dispersal,' or even more generally, as 'release' "; id., 954; it is not necessarily clear that lead needs to be released into an apartment's environment for a child to be exposed. For example, a child may ingest lead by chewing on intact painted surfaces. As the *Sphere Drake Ins. Co.* court observed: "These terms do not ordinarily encompass the type of 'movement' associated with lead paint poisoning." *Sphere Drake Ins. Co.* v. *Y.L. Realty Co.*, supra, 990 F. Sup. 243; see *Generali-U.S. Branch* v. *Caribe Realty Corp.*, supra, 160 Misc. 2d 1062 ("to the extent that Daniel Diaz suffered lead poisoning from eating paint chips, this court is not convinced that his injuries arise out of the discharge, disposal, seepage, migration, release or escape of a pollutant"); cf. *Weaver* v. *Royal Ins. Co. of America*, 140 N.H. 780, 783, 674 A.2d 975 (1996) ("[w]hether the transporting of lead dust from the work site to the [plaintiffs'] car and home was the 'discharge, dispersal, release or escape' of a pollutant is not clear"). Since ambiguity exists regarding this aspect of the clause's

application, Danbury cannot prevail on its motion for summary judgment.

Furthermore, Danbury has not come forward with supporting documentation; see Practice Book § 17-45; demonstrating the absence of a genuine issue of material fact regarding the method by which the minor plaintiff in the underlying action was exposed to toxic levels of lead to satisfy the court that the exposure would fall within the clause's limitations if the clause were not ambiguous. The underlying complaint in the present case alleges only that Kim, the minor plaintiff, was "exposed to dangerous, hazardous and toxic levels of lead paint" on intact and nonintact surfaces and was thereby injured. This court cannot determine the mechanism of Kim's exposure to lead or whether her alleged lead poisoning resulted from ingesting or inhaling lead dust or lead chips, chewing on intact surfaces, a combination of these mechanisms or some other source of exposure.

IV

CONCLUSION

In sum, this court has concluded that the pollution exclusion clause at issue is ambiguous as applied to the particular facts before the court. There is more than one reasonable interpretation as to whether toxic levels of lead paint on the interior and exterior surfaces of a residence may be characterized as a pollutant that was discharged, dispersed, released or escaped. Furthermore, the record does not establish the absence of a genuine issue of material fact regarding the method by which the minor plaintiff was lead poisoned. Accordingly, Danbury's motion for summary judgment is denied.